**WOMANCARE OF SOUTHFIELD, P.C., Northland Family Planning Clinic, Inc., Northland Family Planning Clinic, Inc.—West, Northland Family Planning Clinic, Inc.—East, Scottsdale Womens Center, and Marshall D. Levine, M.D., Plaintiffs,**

v.

**Jennifer M. GRANHOLM, James T. Cherry, Carl L. Marlinga, David G. Gorcyca, and John D. O'Hair, Defendants.**

and

**Mark I. Evans, M.D. Planned Parenthood of Mid–Michigan, Planned Parenthood of Southeast Michigan, Planned Parenthood of South Central Michigan, Planned Parenthood Affiliates of Michigan, and Timothy R.B. Johnson, M.D., Plaintiffs,**

v.

**Jennifer M. Granholm, and John D. O'Hair, Defendants.**

Nos. 00–CV–70585, 00–CV–70586.

United States District Court,
E.D. Michigan,
Southern Division.

March 9, 2001.

Tracie D. Palmer, David S. Steingold Assoc., Detroit, MI, for Plaintiffs.

R. Philip Brown, Ronald J. Styka, Santiago Rios, Michigan Department of Attorney General, Public Health Division, Lansing, MI, Daniel W. Grow, Damm & Tauscher, Detroit, MI, Frank J. Krycia, Macomb County Corporation Counsel, Mount Clemens, MI, Jody L. Strutz, County of Oakland Prosecutor's Office, Pontiac, MI, William G. Pierson, Oakland County Corporation Counsel, Pontiac, MI, for Defendants.

## MEMORANDUM OPINION AND ORDER

TARNOW, District Judge.

## GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### I. Introduction

These two cases are before the Court on the plaintiffs' request for injunctive relief. Plaintiffs are physicians practicing obstetrics and gynecology and providers of women's reproductive health services. The defendants include the Attorney General for the State of Michigan and the prosecuting attorneys for four Michigan counties. Plaintiffs seek a temporary restraining order or preliminary injunction prohibiting Attorney General Granholm and the prosecutors from enforcing Michigan's "Infant Protection Act", 1999 Mich.Pub.Acts 107.[1] The effective date of the Infant Protection Act ("the Act") is March 10, 2000; the Act is to be codified at Mich.Comp.Laws § 750.90g.

The Court conducted a hearing on Plaintiffs' motions for injunctive relief on March 2, 2000. The Court heard testimony from one of the plaintiffs, Dr. Timothy Johnson, as well as oral argument from counsel. During the course of the hearing, Plaintiffs voluntarily withdrew their motion for class certification of the defendants, and dismissed their claims against the four named county prosecutors. Plaintiffs withdrew their motion and dismissed the named county prosecutors based on the representations made by the prosecutors that the prosecuting attorneys in the State of Michigan would be bound by any preliminary injunction the Court may issue. The county prosecutors were dismissed without objection by counsel for the Attorney General. Thus, the Attorney General for the State of Michigan remains the sole defendant in these two cases.

### II. Issues Presented

Plaintiffs claim that the Act imposes an undue burden in the path of women seeking pre-viability abortions and endangers the lives and health of pregnant women. Plaintiffs also assert that the Act is inher-

1. Prior to the hearing, the defendants agreed to be bound by the Court's ruling, without necessity for class certification.

ently vague and violates the rights of physicians who provide abortion services, because it fails to provide clear notice of the conduct proscribed by the Act. Plaintiffs further argue that the Act violates a woman's right to privacy, that the Act violates equal protection standards, and that the Act serves no legitimate state interest.

## III. Findings of Fact

### A. The Act

The Act, to be codified at Mich.Comp. Laws § 750.90g, states:

Sec. 90g. (1) This section shall be known and may be cited as the "infant protection act".

(2) The legislature finds all of the following:

(a) That the constitution and laws of this nation and this state hold that a live infant completely expelled from his or her mother's body is recognized as a person with constitutional and legal rights and protection.

(b) That a live infant partially outside his or her mother is neither a fetus nor potential life, but is a person.

(c) That the United States supreme court decisions defining a right to terminate pregnancy do not extend to the killing of a live infant that has begun to emerge from his or her mother's body.

(d) That the state has a compelling interest in protecting the life of a live infant by determining that a live infant is a person deserving of legal protection at any point after any part of the live infant exists outside of the mother's body.

(3) Except as provided in subsections (4) and (5), a person who intentionally performs a procedure or takes any action upon a live infant with the intent to cause the death of the live infant is guilty of a felony punishable by impris-

onment for life or any term of years or a fine of not more than $50,000.00, or both.

(4) It is not a violation of subsection (3) if a physician takes measures at any point after a live infant is partially outside of the mother's body, that in the physician's reasonable medical judgment are necessary to save the life of the mother and if every reasonable precaution is also taken to save the live infant's life.

(5) Subsection (3) does not apply to an action taken by the mother. However, this subsection does not exempt the mother from any other provision of law.

(6) As used in this section:

(a) "Live infant" means a human fetus at any point after any part of the fetus is known to exist outside of the mother's body and has 1 or more of the following:

(i) A detectable heartbeat.

(ii) Evidence of spontaneous movement.

(iii) Evidence of breathing.

(b) "Outside of the mother's body" means beyond the outer abdominal wall or beyond the plane of the vaginal introitus.

(c) "Part of the fetus" means any portion of the body of a human fetus that has not been severed from the fetus, but not including the umbilical cord or placenta.

(d) "Physician" means an individual licensed to engage in the practice of allopathic medicine or the practice of osteopathic medicine and surgery under article 15 of the public health code, 1978 PA 368, M.C.L. § 333.16101 to 333.18838.

### B. The Parties

#### 1. Plaintiffs

a. Plaintiff WomanCare of Southfield, P.C. ("WomanCare") is a women's repro-

ductive health-care facility in Lathrup Village, Michigan, that provides a full range of gynecological services including: pregnancy testing; non-directive options counseling; abortion up to twenty-four weeks gestational age; contraceptive counseling; contraceptives; and detection and treatment of sexually transmitted diseases. WomanCare sues on behalf of itself, its staff and on behalf of its patients seeking abortions.

b. Plaintiffs Northland Family Planning Clinic, Inc., Northland Family Planning Clinic, Inc.—West, and Northland Family Planning Clinic, Inc.—East (together, "Northland") are women's reproductive health care facilities in Southfield, Westland, and Clinton Township, Michigan, respectively. The Northland facilities provide a full range of gynecological services, including: annual examinations and pap smears; pregnancy testing; non-directive options counseling; contraceptive counseling and services; detection and treatment of sexually transmitted diseases; and community outreach education programs. In addition, Northland provides abortion services up to twenty-four weeks LMP. Northland sues on behalf of itself, its staff and on behalf of its patients seeking abortions.

c. Plaintiff Scottsdale Women's Center is a women's reproductive health care facility in Detroit, Michigan. Scottsdale provides a full range of gynecological services including: pregnancy testing; non-directive options counseling; prenatal care; gynecological care; cancer screening; abortion up to twenty-four weeks; contraceptive counseling; contraceptives; and detection and treatment of sexually transmitted diseases. Scottsdale sues on behalf of itself, its staff and on behalf of its patients seeking abortions.

d. Plaintiff Marshall Levine, M.D., is a physician licensed to practice medicine in the State of Michigan. He is board-certified in obstetrics and gynecology, as well as in medical genetics. He currently specializes in gynecology and provides abortions up to twenty weeks LMP at the Michiana Clinic in Niles, Berrien County, Michigan. Dr. Levine sues on his own behalf and on behalf of his patients seeking abortions.

e. Plaintiffs Mark Evans, M.D. and Timothy R.B. Johnson, M.D. are physicians licensed to practice medicine in Michigan. Dr. Evans is board-certified in clinical genetics and in obstetrics and gynecology; Dr. Johnson is board-certified in obstetrics and gynecology, with a sub-certification in the area of maternal-fetal medicine. Drs. Evans and Johnson provide their patients an array of services including prenatal care, fetal diagnoses, labor and delivery, treatment of miscarriage, and abortions. Dr. Evans also provides fetal therapy. Drs. Evans and Johnson provide gynecological and obstetrical procedures that fall within the proscriptions of the Act, including abortions using the suction curettage, dilation and evacuation (D & E), and induction methods, and treatment of miscarriage. Drs. Evans and Johnson sue on their own behalf and on behalf of their patients.

f. Plaintiffs Planned Parenthood of Mid–Michigan, Planned Parenthood of Southeast Michigan, and Planned Parenthood of South Central Michigan are not-for-profit reproductive health care facilities in Michigan that provides their patients a range of obstetrical and gynecological services, including pregnancy testing; non-directive options counseling; contraceptive counseling; contraception; detection and treatment of sexually transmitted diseases; and abortions using the suction curettage and D & E abortion methods. These Planned Parenthood facilities reasonably fear that if they continue to perform abortions, they

will suffer criminal prosecution under the Act. Plaintiff Planned Parenthood Affiliates of Michigan is a not-for-profit corporation that represents and supports the Planned Parenthood affiliates in Michigan.

### 2. Defendant

Defendant Jennifer M. Granholm is the Attorney General of the State of Michigan. She is responsible for enforcement of the Act. Defendant Granholm is sued in her official capacity.

### C. Joint Stipulated Statement of Facts

Prior to the start of the hearing, the parties entered into a joint stipulated statement of facts. Defendants agreed to the stipulation for the limited purpose of setting forth the type and nature of commonly-performed abortion procedures. The defendants did not stipulate as to the desirability, frequency, or safety of one procedure versus another. The stipulated facts are as follows:

1. For early abortions, physicians typically use suction curettage, also called vacuum aspiration or dilation and curettage (D & C). In this procedure, the physician dilates the cervix, which is the narrow, lower part of the uterus that opens into the vaginal canal. After dilating the cervix, the physician grasps the cervix with a tenaculum. The tenaculum stabilizes the cervix and pulls the uterus and the cervix down toward the vaginal introitus. Such traction on the cervix is important because it straightens out the cervical and endometrial (uterine) canals. The physician then inserts a cannula (tube) through the cervix and into the uterus, and removes the embryo or fetus and the other products of conception (such as amniotic fluid and membranes). The tube is attached to a manual or electrical device that creates a vacuum, which empties the contents of the uterus by suction. The physician usually draws the fetus out in pieces, but sometimes extracts it largely intact. Suction curettage procedures vary, depending on the circumstances of the individual patient, the individual physician, and the particular surgery. A new method of early "medical" abortion is also now becoming more common, although it accounts for a very small percentage of first-trimester abortions. Generally available only through seven weeks LMP,[2] this method involves administering medications, such as methotrexate or mifepristone (RU–486) and misoprostol, which interfere with the developing gestation and make the uterus contract and expel the embryo or fetus. Sometimes the medications fail or do not result in a complete evacuation of the uterus, necessitating surgical procedures such as suction curettage to complete the abortion. First-trimester abortions are the safest abortions because they take place earliest in pregnancy.

2. After the first trimester, when the fetus is generally too large to remove exclusively by means of suction, physicians use one of two methods: dilation and evacuation (D & E) which accounts for over 95% of post first-trimester abortions nationally, or induction, which accounts for under 5% of such abortions. (*Citation omitted.*) Hysterectomy and hysterotomy account for less than 1% of post first-trimester abortions. The figures for Michigan are comparable.

3. At the outset of a D & E procedure, the physician dilates the cervix, typically over twelve to thirty-six hours, with multiple intracervical osmotic dilatory made of

---

**2.** The abbreviation "LMP" refers to the woman's last menstrual period; seven weeks LMP would imply that seven weeks have elapsed since the date of the woman's last menstrual period.

either laminaria (seaweed) or a synthetic agent. The osmotic dilatory absorb moisture and expand slowly in the cervix. When the cervix is sufficiently dilated, the physician removes the dilatory and then grasps the cervix with a tenaculum, again, shortening the distance between the cervix and the vaginal introitus. The physician then removes the fetus and the other products of conception using a combination of forceps, suction curettage, and sharp curettage. The calvarium (skull) is often too large to pass through the cervix intact, and the physician must compress it, either with a suction cannula or with forceps. The evacuation part of a D & E usually takes less than thirty minutes. Although physicians in my department generally use suction curettage to fifteen weeks LMP, and start using D & E after that point, many physicians start using D & E at twelve or thirteen weeks LMP.

4. In a D & E, the physician usually disarticulates the fetus. This usually happens after the physician has used forceps to draw a non-severed fetal part through the external cervical os, which creates counterpressure between the internal cervical os and the rest of the fetus remaining in the uterus. As the physician then pulls on the forceps, non-severed parts of the fetus are subsequently disarticulated and removed as a result of counterpressure. The physician repeats this procedure until the uterus is completely evacuated. A physician performing a D & E is also sometimes able to remove the fetus largely intact. In any D & E, for example, the physician may extract the fetal body intact, feet first, until the cervix is obstructed by the aftercoming head, which may be too large to pass through the cervix. At that point, the physician uses some surgi-

cal procedure—such as collapsing the skull with forceps—to reduce the size of the head so that it can pass through the cervical os.[3]

5. Several factors determine how a D & E progresses—including the size and orientation of the fetus, the amount of cervical dilation, the state of the cervix and uterus, the patient's overall health and medical condition, and the skill and experience of the physician. The physician adapts the technique in light of the individual patient's circumstances and needs, and best medical practice. According to statistics compiled by the Centers for Disease Control and Prevention (CDC), D & E is generally the safest method of abortion available after the point in any pregnancy at which suction curettage is no longer effective. These CDC figures, although compiled in the 1980's, remain universally relied on in the medical community. *See* David A. Grimes & Kenneth F. Schulz, *Morbidity and Mortality from Second–Trimester Abortions*, 30 J.Repr.Med. 505, 509 (1985).

6. Aside from the D & E, the other common method of post first-trimester abortion is induction, which often entails using osmotic dilators as described above for D & E, and then using medications to induce premature labor. There are several variations of induction abortions, and many physicians use them in combination. One method is to inject a labor-inducing agent such as Pitocin or oxytocin intravenously, continuously over many hours. A second method—instillation—involves injecting agents such as prostaglandins, prostaglandins and urea, or hypertonic saline into the amniotic sac. A third method involves introducing prostaglandins into the vagina or cervix. A fourth method entails intramus-

---

**3.** This type of D & E procedure, where the fetal body is removed intact, and the skull is then collapsed to allow it to pass through the cervical os, is sometimes referred to as an "intact D & E" or "D & X" procedure.

cular injection of prostaglandins. Inductions generally take place in a hospital or hospital-level setting. Inductions are not typically done before sixteen weeks LMP, as they are generally less successful and more difficult to perform earlier than that. Inductions sometimes fail, or do not result in complete evacuation of all the products of conception. For that reason, in my clinical experience, a separate procedure, usually a D & E or dilation and curettage (D & C), is necessary to remove the fetus or placenta in approximately 10% – 25% of inductions.

7. For most women, inductions are safe procedures, and they usually result in an intact fetus. Induction abortions nonetheless involve the same general medical complications and physiological stress as labor and delivery at term, with contractions that last from ten to thirty hours. That alone often makes induction contraindicated for women with various medical conditions, such as cardiac ailments or a prior hysterotomy or prior "classical" (high) Cesarean section. Certain complications and contraindications are also associated with specific methods of induction. Hence, once again, the physician must select and perform each procedure appropriately: avoid induction altogether—or a particular inducing agent—if the individual patient has a contraindication; and finish the procedure surgically if the medical induction fails.

8. Hysterotomy and hysterectomy constitute major abdominal surgery, and are generally justified as abortion methods only when the woman has some medical condition that independently requires such surgery. Hysterotomy is an incision made in the uterine wall through which the physician removes the fetus from the opened uterus. Hysterotomy in the second trimester is significantly more dangerous than a Cesarean section at term because it involves cutting through the uterine wall when it is much thicker. During any future pregnancy—even before labor—a prior hysterotomy can cause uterine rupture and catastrophic bleeding. To avoid the unacceptably high risk of rupture during labor, a woman with a prior hysterotomy must have a Cesarean section in any future childbirth. Hysterectomy is the removal of the uterus, which results in a complete loss of fertility. Hysterectomy and hysterotomy thus entail significantly higher rates of morbidity and mortality than are associated with either D & E or induction. Nonetheless, in rare instances, one of these methods is appropriate for a particular patient.

9. Miscarriage—the "spontaneous abortion" of an embryo or pre-viable fetus—is an extremely common occurrence, particularly in the first trimester of pregnancy. Approximately 24% of all pregnancies end in miscarriage. Once a miscarriage is inevitable, a physician will ensure that all contents are evacuated from the uterus, usually by performing a surgical procedure such as a D & C. Complete and swift uterine evacuation is necessary to prevent infection of any retained tissue, and to control bleeding, which can occur until the uterus is empty and contracts.

## D. Testimony Regarding the Michigan Statute

Plaintiff Timothy Johnson, M.D. was the only witness who testified at the hearing. The Court recognized Dr. Johnson as an expert witness. During his testimony, Dr. Johnson read the joint stipulated facts into the record.

Dr. Johnson testified that, in his own practice, he performs abortion procedures. Dr. Johnson further testified that he had read the Act and that, as a practicing physician, he did not understand exactly what procedures would be prohibited by

the Act. He testified that the Act does not name any particular specific procedures.

Dr. Johnson defined "fetus" for the Court. "[A] fetus is a pregnancy. It's a baby inside the mother's uterus until the time of delivery ... For us, we use the term 'fetus' until delivery has occurred, and then after delivery we use the term 'infant'." at 25. Dr. Johnson also defined "viability" for the Court:

> Well, "viability" medically to me means the ability of the fetus to survive outside the uterus. So, when I talk about viability, there really are two major issues for me. One is a gestational age marker. Generally we consider viability in terms of gestational age, a gestational age at which the majority of fetuses will survive outside the uterus. And we generally use somewhere between 24 and 26 weeks clinically as a marker of gestational age viability. In addition, we use the term "viability" to describe fetuses who have the potential to survive and live normally outside the uterus. So that a fetus with a lethal abnormality, with a major developmental abnormality which does not permit normal survival would also be considered a nonviable fetus.

Dr. Johnson testified that, in his opinion, the Act describes procedures he takes in treating miscarriages, and in delivering nonviable fetuses at term. Dr. Johnson further testified that if the Act were to take effect, he does not know whether or not he, and the physicians under his supervision, would continue to perform abortions as they currently do. Dr. Johnson's testimony reflected his opinion that, based on the Act, he and other physicians might alter their medical practices and simply stop performing some procedures.

Dr. Johnson testified that when a physician performs an abortion procedure, such as suction curettage, D & E, or induction, the physician knows, based on gestational age criteria, that the fetus cannot survive. The purpose of the abortion procedure is to cause the demise of the fetus.

Dr. Johnson described each of the common abortion procedures. He first described the suction curettage, or D & C procedure. Dr. Johnson stated that a fetus may be removed from the uterus, through a suction cannula, in pieces, or it may be removed largely intact. He stated that during suction curettage, it is possible for a fetal part, which has not been severed from the fetus, to have passed beyond the vaginal introitus and for the fetus, at that point, to have a detectable heartbeat. Dr. Johnson testified that, since he may take action on the fetus in that situation, with the intent to cause fetal demise, he would fear prosecution under the Act for performing a suction curettage procedure.

Dr. Johnson then described the D & E abortion procedure. He testified that when he performs a D & E he tries to remove as much of the fetus as he can with each grasp of the forceps. "[I]f all the fetal tissue could be removed with a single pass of the ring forceps and with removal of that tissue, that would certainly be a goal." The physician may attempt to remove the fetus as intact as possible, to avoid damage to the uterus from fetal bones and body party, and/or uterine perforation from repeated insertion of the instruments. Intact removal of the fetus may be medically advantageous for the woman, because it involves a shorter length of procedure time, it reduces blood loss, and it reduces the woman's exposure to anesthesia. Dr. Johnson testified that during the D & E procedure, it would be possible to bring a fetal part, such as a leg, through the vaginal introitus while the fetus was still intact. He stated that it would be possible for the fetus, at that point, to have a detectable heartbeat, evi-

dence of movement, and/or evidence of breathing. During the procedure, the fetal part may become disarticulated from the fetus during counterpressure, traction, or a rotational procedure. Dr. Johnson declared that if the Act were to take effect, he would fear prosecution for performing a D & E procedure in which he disarticulated the fetus.

Dr. Johnson described a D & E procedure where the physician is able to remove the fetus largely intact. Typically the fetus is brought out of the uterus, through the cervix, feet first. Sometimes the fetal head lodges at the cervix, and the physician is unable to continue to remove the fetus. At that point, the physician may reduce the size of the fetal head to allow it to pass through the cervix. The physician may reduce the size of the fetal head by collapsing the skull. Dr. Johnson testified that at the time the physician collapses the fetal skull, the fetus may have a detectable heartbeat. With regard to a fetus that may have a detectable heartbeat, Dr. Johnson stated, "I would be delivering a non-severed part of the fetus that had passed the plane of the introitus and performing an act or medical procedure that would cause the death of the fetus." He testified that, if the Act took effect, he would fear prosecution for performing a D & E in this manner.

The doctor also testified regarding induction abortions. Dr. Johnson's testimony was that, as a result of induction, he may deliver or remove the fetus intact. The fetus may, at that point, still have a detectable heartbeat. Dr. Johnson asserted that if the Act were to take effect, he would fear prosecution for performing induction procedures.

Dr. Johnson further testified that, due to fetal abnormalities or congenital syndromes, it is possible for the fetal abdomen to become massively distended. The dis-

tention would prevent a normal delivery post-induction. Therefore, the physician may take measures to relieve the abdominal obstruction such that the fetus may be completely removed. As with some D & E procedures, it is also possible, during induction procedures, for the fetal head to become entrapped in the uterus. Dr. Johnson stated that, in that case, "relieving the obstruction is the medically appropriate thing to do. So, decompressing the skull, changing the shape and geometry of the skull with forceps or something to facilitate the passage of that body part through the cervix could be the appropriate medical procedure." The doctor again testified that he would fear prosecution for performing induction procedures in which he collapses the fetal skull, if the Act were to take effect.

Dr. Johnson next testified as to hysterotomy procedures. The doctor stated that, during a hysterotomy, when the fetus is brought through the incision and past the abdominal wall, the fetus often does have a heartbeat. He testified that he would fear prosecution under the Act for performing hysterotomies because, "a non-severed portion of the fetus ... [is] brought beyond the outer abdominal wall, and then a procedure and action [is] taken that would lead to the death of the fetus."

Dr. Johnson testified as to the care provided to women suffering miscarriages. The doctor testified that a woman miscarrying could present to the physician with a non-severed fetal part, such as an arm or a foot, beyond the plane of the vaginal introitus. He further testified that at that point in a miscarriage it is possible for the fetus to have a detectable heartbeat, evidence of movement, and/or evidence of breathing. The physician would, at this point, take action, such as crushing the fetal skull or some other part of the fetus, to remove the remainder of the fetus and placenta from

the mother. Dr. Johnson testified that he knew that taking such an action would cause fetal demise. He further stated that if the physician failed to take any action, he could wait to see if the fetus would pass spontaneously, but the woman would continue to have contractions, and would continue to bleed. The physician may take steps to evacuate the uterus in this instance, to decrease pain, decrease risk of infection, decrease bleeding, and/or minimize complications for the woman. Dr. Johnson testified that if the Act took effect, he would fear prosecution for treating miscarriages where any non-severed part of the fetus had passed the introitus, because any action he might take would lead to the death of the fetus.

Finally, Dr. Johnson testified as to the delivery of non-viable fetuses at term. He stated that in delivering a non-viable fetus at term, he knows that his continued delivery of the fetus will cause its demise. In fact, Dr. Johnson's testimony was that he may intentionally cause the death of a non-viable fetus at term, in order to facilitate the delivery. The doctor offered, as an example, the situation of a fetus with a congenital anomaly, such as the absence of normal kidneys. A fetus with such a disorder may present with a massive amount of fluid in the abdomen, at the time of delivery. This fluid distention may cause the fetus to become trapped in the birth canal, once the head is delivered. The physician may take action to empty the contents of the abdomen to facilitate the delivery of such a fetus. The physician's action, taken to evacuate the abdomen, would cause the death of the fetus. Dr. Johnson's testimony was that, under such conditions, he would fear prosecution under the Act for delivering non-viable fetuses at term.

Counsel for Plaintiffs also elicited opinion testimony from Dr. Johnson. Dr.

Johnson testified that, "if physicians were inhibited or prevented from doing a medically appropriate procedure on a woman to preserve her health, I think that would have a pretty obvious effect on that woman's health." In his opinion, Dr. Johnson stated that women who seek abortions, "would either seek illegal abortions, they would have later abortions that they obtained somewhere else, and that the morbidity and mortality from those events, the health complications and the death complications, would also increase." The doctor opined that, if Michigan physicians stopped performing abortion procedures, some women would be prevented from obtaining abortion services at all. Some Michigan women may lack the resources or the transportation to travel outside of Michigan to obtain an abortion. Women who do travel outside of Michigan to obtain an abortion may have an increased risk, due to delay in obtaining the procedure.

Dr. Johnson also testified that some physicians, despite the Act, may attempt to continue providing the same abortion services they currently provide to Michigan women, under threat of prosecution. Dr. Johnson offered an opinion that, "if physicians were in fear of prosecution, that they would probably change their practice ... I would be having chest pain if I were the practitioner."

Counsel for Plaintiffs next directed Dr. Johnson to review Section Four of the Act. Specifically, counsel referred to the statement that Section Three of the Act is not violated if the physician takes measures that, "in the physician's reasonable medical judgment are necessary to save the life of the mother and if every reasonable precaution is also taken to save the live infant's life." 1999 Mich.Pub.Acts 107, § 4. Dr. Johnson was asked for his medical opinion as to whether this section of the Act ade-

quately protects the health of a pregnant woman. Dr. Johnson stated:

> Well, there's no exception in that section for the health of the mother. The only exception is the life of the mother. So, as I read it, I could exercise my reasonable judgment to save the mother's life if I thought that her life was immediately at risk, but not her health, as I read this statute.

Dr. Johnson also testified that he was uncertain as to who would interpret what constitutes "reasonable medical judgment", within the context of the statute. His testimony was that, if he were ever prosecuted under the Act, he would fear that his "best medical judgment" could be second-guessed or criticized as unreasonable or not necessary, by some physician testifying as a witness for the prosecution. Dr. Johnson stated that there may be situations where the actions he would take, such as evacuating the uterus (causing fetal demise in the process), would be the most medically appropriate treatment to stop a woman from hemorrhaging. However, in that same instance, the woman might also be treated by transfusing her to replace the blood she is losing, and delay taking other action. In that situation, the physician's evacuation of the uterus may be the most appropriate medical action, but not necessarily the only action that could be taken. Thus, if evacuation of the uterus under those circumstances is not the only action that the physician may choose, the action may not be "necessary" under the statute. The physician may fear that taking what he believes to be the most medically appropriate action, but perhaps not the only available action, may result in prosecution under the Act.

## IV. Conclusions of Law

### A. Standing

Defendants filed a Motion to Dismiss the Complaints, alleging that Plaintiffs do not have standing to bring their actions. Defendants claim that there is no Article III case or controversy, and therefore, this Court lacks subject-matter jurisdiction to hear the case. Defendants argue that Plaintiffs must have suffered an "injury in fact", or "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent." (Defendants' Brief, page 3, *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).) This same type of argument was made in *Cyberspace v. Engler*, 55 F.Supp.2d 737 (E.D.Mich.1999), and in *Evans v. Kelley*, 977 F.Supp. 1283, 1302 (E.D.Mich.1997), *appeal not taken*. In *Cyberspace*, this Court held that the plaintiffs had standing:

> because an alleged injury is "certainly impending", if the statute takes effect and the material they disseminate is deemed "sexually explicit". No one should have to go through being arrested for a felony, publicly shamed, and pay for a defense only to have a court find that the newly enacted statute is unconstitutional. This can, and should, be determined before such injury occurs. Such a challenge can be brought by those that may be accused, or injured in fact, by such a statute. *Cyberspace* at 745–746.

■ The same analysis may be utilized to find that Plaintiffs in these cases also have standing to bring their claims. Plaintiffs are clinics and physicians who perform abortions in the State of Michigan. Physicians may intentionally perform procedures upon a fetus that has passed beyond the mother's vaginal introitus, where the fetus has a detectable heartbeat, spontaneous movement, or spontaneous respiration. If the physicians act with the intent to cause the death of the fetus, the

physicians may, then, be arrested, charged with a felony, and have to pay for their defense, only to have a court later determine that the statute is unconstitutional. The physicians in such a case may be accused, or injured in fact, and may therefore bring a constitutional challenge to the statute.

Standing was also addressed in this District in *Evans, supra.* "The Supreme Court has made clear that when prosecution seems apparent, a litigant need not first expose himself to actual arrest or prosecution to be entitled to challenge the constitutionality of a statute." *Evans, supra* at 1302, *citing Steffel v. Thompson,* 415 U.S. 452, 457–459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). The *Evans* Court also discussed the applicability of *jus tertii* standing in the context of abortion cases. "Plaintiffs in this case have standing 'to assert the rights of women patients as against governmental interference with the abortion decision' and, therefore, have standing to mount their challenge on overbreadth/undue burden grounds as well as on vagueness grounds." *Evans, supra* at 1303, *citing Volunteer Medical Clinic, Inc. v. Operation Rescue,* 948 F.2d 218, 222–223 (6th Cir.1991), and *Planned Parenthood v. City of Cincinnati,* 822 F.2d 1390 (6th Cir.1987).

Thus, the Court finds that Plaintiffs in the instant cases, WomanCare, et al., and Evans, et al., have personal standing, on behalf of themselves, to challenge the constitutionality of the Act. Further, the physician plaintiffs also have *jus tertii* standing to challenge the constitutionality of the Act on behalf of their pregnant patients. Defendants' Motion to Dismiss, based on lack of standing, is *without merit.*

## B. Standard for Injunctive Relief

Plaintiffs contend that the Michigan Infant Protection Act is unconstitutional. Plaintiffs set forth arguments that the Act places an undue burden in the path of pregnant women seeking abortions, and that the Act is unconstitutionally vague because it fails to set forth with particularity the conduct it proscribes. Plaintiffs argue that the Act fails to adequately protect the health and lives of pregnant women. Plaintiffs also argue that the Act violates a woman's right to privacy, that the Act violates equal protection standards, and that the Act serves no legitimate state interest.

■ The Sixth Circuit has enumerated four factors a District Court should consider when deciding whether to grant a Motion for Preliminary Injunction:

(1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief. *Nightclubs, Inc. v. City of Paducah,* 202 F.3d 884, 888 (6th Cir.2000), *citing Connection Distrib. C. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998), *cert. denied* 526 U.S. 1087, 119 S.Ct. 1496, 143 L.Ed.2d 650 (1999).

Accordingly, this Court's analysis of Plaintiffs' Motions for Preliminary Injunction follows the framework set forth by the Sixth Circuit in *Nightclubs, supra.*

## 1. Likelihood of Success on the Merits

### a. Undue Burden

■ Plaintiffs argue that the Supreme Court set forth the standard for analyzing the constitutionality of abortion statutes in *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Plaintiffs state that the holding in *Casey* established that regulation of

abortion is subject to an "undue burden" analysis. "Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." *Casey, supra* at 874, 112 S.Ct. 2791. An undue burden exists if, "a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877, 112 S.Ct. 2791.

Plaintiffs' argument is that the Act prohibits actions which are intended to cause the death of a live fetus. That is, if any intact part of a fetus that possesses a detectable heartbeat, spontaneous movement, and/or spontaneous respiration passes beyond the vaginal introitus (or beyond the abdominal wall), and the physician acts with the intent to cause the death of that fetus, he or she would be guilty of violating the Act. Plaintiffs claim that, because a fetus as young as eight weeks' gestation may demonstrate a heartbeat, the Act, in effect, bans all abortions after the eighth week of gestation.

Plaintiffs point to *Casey* in support of their argument that Michigan's Infant Protection Act is an undue burden on the right to seek an abortion. Plaintiffs argue that the Act criminalizes otherwise legal abortion procedures, specifically D & C, D & E, and D & X, beyond the time that a fetus may demonstrate a heartbeat, breathing, or movement. Plaintiffs argue that these factors—heartbeat, breathing, or movement—do not define fetal viability, but may, in some instances be present prior to viability. As such, procedures now legally performed by the plaintiffs which fall within the "previability stage", will be banned after the Act goes into effect. Plaintiffs therefore claim that the Act places substantial obstacles in the paths of women seeking otherwise legal

abortions of nonviable fetuses. Consequently, Plaintiffs argue, the Act is an undue burden on a woman's right to choose to terminate her pregnancy prior to the stage of viability, and, as such, would presumptively be declared unconstitutional. Thus, Plaintiffs have met their burden of demonstrating a likelihood of success on the merits of a constitutional challenge under the undue burden analysis of *Casey.*

The defendants argue that the plaintiffs do not have a substantial probability of success on the merits of their challenge. The defendants point to the "bedrock principles of jurisprudence" outlined in *Evans, supra.* Those bedrock principles are: a district court must follow U.S. Supreme Court precedent; state statutes enjoy a presumption of constitutionality; and federal courts should take care not to substitute their own judgment for that of a state legislature when deciding whether to enjoin state laws. (Defendants' Brief, pages 11–12, and *Evans, supra* at 1302–1304.) This Court does agree that an Act of the state should be afforded great respect. The *Evans* Court, however, after describing those bedrock principles, did go on to declare the Michigan "partial birth abortion" statute unconstitutional. Thus, while those bedrock principles may be considered an accurate description of federal jurisprudence, they certainly do not prohibit a federal court from determining that a state law is unconstitutional.

The defendants' main argument is that there is no constitutionally protected right to "kill a living child once the process of birth has begun". Defendants claim that neither *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), *rehearing denied* 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973), nor *Casey, supra,* govern the principles of infanticide. The defendants' argument is that the plaintiffs have no constitutional right to kill an in-

tact, living child who has been partially born.

Defendants draw a line between terminating pregnancy and terminating birth. Defendants argue that, as a result of the birth process, whether the birth is complete or partial, the legal status of the child changes. The defendants attempt to distinguish between abortion, which they claim takes place *in utero*, and the process of killing an intact, living child in the process of being born. Defendants claim that the Act, "does not apply to abortion at all, understood as pregnancy termination. It punishes infanticide/feticide regardless of the reason or manner of delivery. Rather, the Act forbids killing a live infant." (Defendants' Brief, page 3.)

It is clear from Defendants' Brief that the procedure they seek to prohibit is the D & X procedure—the "partial birth abortion".[4] Defendants urge the Court to adopt the construction of the Act offered by the Attorney General of the State of Michigan, that the Act, "will prohibit only the D & X procedure." (Defendants' brief, page 34.) Defendants claim that nothing in *Roe* or *Casey* prohibits the state from protecting the interests of a living child. Instead, the defendants themselves point out that *Casey* proscribed any prohibitions which presented an undue burden on the termination of pregnancy before the viability of the fetus. Defendants attempt to argue that, because the fetuses they seek to protect are in the process of birth and, if the statute applies as written, would possess a heartbeat, spontaneous respiration, and/or spontaneous movement, the fetuses have progressed beyond the stage of previability termination shielded by *Casey*.

Is Michigan trying to redefine fetal viability? The definition of "viability" and the application of the presence of a heartbeat, spontaneous respiration, and/or spontaneous movement on the demarcation of viability, are questions better left to medical experts and ethicists. While there may never be a definitive, legal determination of exactly when "life" begins, there must be a determination of when "viability" begins. The *Casey* Court recognized that advances both in maternal health care and in neonatal care, have narrowed the gap between the dates abortions may be safely performed and the age of viability. *Casey, supra* at 860, 112 S.Ct. 2791. However, the Court also recognized that:

> these facts go only to the scheme of time limits on the realization of competing interests, and the divergences from the factual premises of 1973 have no bearing on the validity of *Roe*'s central holding, that viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions. *Id.*

With regard to the issue of viability, *Casey* is clear—states may not place an undue burden on a woman's right to terminate her pregnancy prior to the viability of the fetus. If the legislature seeks to "lower the bar" and reduce the age of viability in this State, then their purpose is not well served by the "Infant Protection Act". The Act, as interpreted by Plaintiff Timothy Johnson, M.D., who testified as a medical expert and who routinely performs abortion procedures, would place an undue burden on a woman's right, prior to fetal viability, to have her pregnancy terminated by a D & E or D & X procedure. As

4. "In 30 states, nearly identical laws have been passed banning 'partial birth abortion'. In 20 of the 21 challenges that have been mounted, courts have tossed out the bans."

Cynthia Cooper, *Partial Birth Abortion, Total Confusion* (visited March 7, 2000) <http://www.vote.com/m.../editorials/editorial4396796.phtml>.

842

such, the Act would not be expected to pass constitutional muster. Thus, Plaintiffs would likely be successful on the merits of their challenge.

### b. Failure to Protect the Lives and Health of Pregnant Women

Plaintiffs' second argument is that the Act fails to provide safeguards to protect the lives and reproductive health of pregnant women. Plaintiffs point to *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), *overruled in other respects by Casey, supra.* Plaintiffs argue that the *Thornburgh* Court held that a state may not, at any point during pregnancy, regulate abortion in ways that fail to require the maternal health be the paramount consideration of the physician. *Thornburgh, supra* at 768–769, 106 S.Ct. 2169. The Act provides that the statute is not violated, "if a physician takes measures at any point after a live infant is partially outside of the mother's body, that in the physician's reasonable medical judgment are necessary to save the life of the mother ..." 1999 Mich.Pub. Act 107, § 4.

Plaintiffs contend that the Act's exception, "necessary to save the life of the mother" is not an effective exception, because it does not permit a banned act or procedure, even when necessary to protect the health of the pregnant woman. The plaintiffs also point to the requirement that the measure must be "necessary" according to the physician's reasonable medical judgment. Plaintiffs argue that physicians will be hesitant to perform these procedures only to face criminal penalties later, if in hindsight, the procedure is determined not to have been "reasonable" or "necessary".

The Supreme Court declared that, as with any other medical procedures, states may enact laws which seek to protect the health or safety of a pregnant woman seeking abortion services. *Casey, supra* at 878, 112 S.Ct. 2791. However, the Court also held that, "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Id.* at 878, 112 S.Ct. 2791. Plaintiffs argue that because the Act requires the physicians' actions be "necessary" to saving the mother's life, physicians will fear performing the banned action, even if it would be the medically most appropriate decision. Dr. Johnson's testimony supports that argument. The plaintiffs cite, as an example, the fact that if other measures, such as providing transfusions, exist as alternative methods for "saving the woman's life", the abortion procedure, though it may be the most appropriate medical care, would not be "necessary", and the physician would risk violating the Act.

Defendants counter the plaintiffs' arguments by stating that, "[a] physician's discretion is not absolute". (Defendants' Brief, page 19.) Defendants argue that, since the Act regulates birth and not abortion, "subjective medical judgment must give way to the State's regulation as long as it has a rational basis." (Defendants' Brief, page 19.) Semantics aside, it is clear to the Court, by the defendants' own representations, that the Act intends to regulate D & X/"partial birth" abortion. As such, the Act is subject to the Court's analysis under the progeny of abortion cases.

Defendants cite *Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), in support of their argument. However, *Glucksberg* concerned assisted suicide—not abortion regulation. Defendants' claim that they wish to "prevent a slippery slope by erecting a

firm barrier against infanticide" does not remove the Court's analysis of the Act from the realm of abortion-law precedent. Defendants' argument that the Act might survive Plaintiffs' constitutional challenge, if the Court were to apply the "reasonably related to a legitimate purpose" analysis of *Glucksberg,* rather than the "undue burden" analysis of *Casey* must fail. Thus, within a framework of analysis under the Supreme Court holdings in *Casey,* it is likely that Plaintiffs would succeed on the merits of their claim that the Act is unconstitutional, because it fails to provide safeguards for both the life and the reproductive health of the mother.

### c. Void for Vagueness

Plaintiff's third argument is that the Act is unconstitutionally vague. Plaintiffs claim that the Act, "is void for vagueness in violation of the Fourteenth Amendment's Due Process Clause because it fails to give fair notice of what specific medical procedures it proscribes." Dr. Johnson's testimony at the hearing makes it clear that he, as a physician and practitioner of abortion procedures, does not understand exactly what the Act prohibits.

Defendants themselves recognize the vagueness analysis utilized in *Evans:*

> The due process clauses of the Fifth and Fourteenth Amendments require that the laws provide persons subject to regulation under them, "a reasonable opportunity to know what [conduct] is prohibited, so that [they] may act accordingly." *Evans, supra* at 1304, *quoting Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

The defendants argue that the statute is not vague because the Act provides for the common and ordinary meaning of the terms and definitions and therefore the statute provides, "sufficient guidance to law enforcement officials" without permitting discriminatory or arbitrary application.

The defendants' own argument, however, is weakened by the fact that the defendants' brief states that the intent of the statute is to prohibit only the D & X procedure. "Appropriately construed, as stated herein, 1999 P.A. 107 will prohibit only the D & X procedure. Such a limited prohibition, is justified ..." (Defendants' brief, page 34.) The statute, on its face, does not, in any way, limit the Act to only D & X procedures. If the intent of the legislature were to prohibit D & X procedures, then the Act, as written, is inherently vague. "A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Evans, supra* at 1304, *quoting Smith v. Goguen,* 415 U.S. 566, 573 n. 8, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

The lack of clarity in the prohibitions of the Act was evident during the hearing. Defendants, themselves, initially argued in their brief that D & X was the only act prohibited by the statute. However, at the conclusion of the hearing, Defendants then declared that the Act would ban not only the D & X procedure, but any D & E procedure, "that results in the crushing of the fetus' skull after the fetus has traversed the plane of the vaginal introitus." The Court recognizes that there may not be much difference, if any, between the D & E procedure wherein the fetal skull is crushed, and the D & X procedure. However, it is clear to the Court that even the Attorney General may have difficulty in interpreting exactly what procedures the Act proscribes. Thus, it is likely that the plaintiffs will be successful on the merits of

their challenge to the Act as being void for vagueness.

### d. Failure to Serve A Legitimate State Interest

Plaintiffs claim that the Act is unconstitutional because, at the very minimum, a State must have a rational basis for regulating the conduct of persons. "This principle is implicit in *Casey*'s framework for evaluating regulations of reproductive health care under the Constitution .... and requires that such regulations serve at least some legitimate state interest." (Plaintiffs' Brief, page 22.) Plaintiffs' assert that the Act does not serve to protect either of the two interests identified by the *Casey* Court—"interests in the health of the woman and in protecting the potential life within her." *Casey, supra* at 871, 112 S.Ct. 2791. Plaintiffs argue that the Act threatens, rather than protects, the health of pregnant women by limiting the procedures their doctors, without fear of prosecution, may provide.

Plaintiffs seem to recognize that the state may have an interest in protecting potential life. The plaintiffs argue, however, that such an interest cannot justify what they perceive to be the statute's total ban on abortions past the eighth week LMP. "Although Michigan has a clear and important interest in protecting the life of viable fetuses, nothing in the Act limits the ban's reach to viable fetuses." (Plaintiffs' brief, page 23.) The Court agrees.

Defendants reply that the Act is reasonably related to a valid state purpose. (Defendants' brief, page 23.) The defendants construe the plaintiffs' challenge as a facial challenge, and cite *U.S. v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) for the proposition that the plaintiffs must establish that the Act would not be valid under any set of circumstances. Defendants argue that the plain-

tiffs may only attack the statute on its face. Since the Act has yet to be enforced, an "as applied" challenge would be premature. However, the Court recognizes that the Sixth Circuit expressly rejected the application of *Salerno* to facial challenges to abortion statutes. "We join the majority of courts that have considered this issue and conclude that *Salerno* is not applicable to facial challenges to abortion regulations." *Women's Medical Professional Corporation v. Voinovich, et al.,* 130 F.3d 187, 193 (6th Cir.1997), *cert. denied* 523 U.S. 1036, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998).

In *Voinovich,* at 194, the Sixth Circuit, instead, adopted the rule set forth in *Casey,* that an abortion law is facially unconstitutional if, "it will operate as a substantial obstacle to a woman's choice to undergo an abortion." Although Defendants choose to criticize the Sixth Circuit's decision, Defendants also recognized that this Court is bound by Sixth Circuit precedent. The holding in *Voinovich, supra,* that an abortion law cannot survive a facial constitutional challenge, if it operates as a substantial obstacle to a pregnant woman's ability to choose abortion, is binding on this Court.

Plaintiffs' suggestion that the state has no legitimate interest in protecting the life within a pregnant woman is without merit. There is no doubt that the State seeks to protect a legitimate state interest—the protection of the unborn life within the mother—as suggested by *Casey.* However, in seeking to protect its interests, the state must take care to do so within the framework of the Constitution. In creating prohibitions and regulating abortion, the Sixth Circuit has made it clear that the state must not create an undue burden on a woman's right to choose a previability termination of her pregnancy.

### e. Right to Privacy

The WomanCare Plaintiffs' Brief also raises a privacy argument. This argument, however, is based on several of the principles previously discussed: undue burden; failure to provide adequate "health" exception; an outright ban on all post 8–week LMP previability abortions. Plaintiffs argue that privacy rights are subject to a strict scrutiny standard. The plaintiffs recognize that *Casey* adopted an "intermediate" level of scrutiny—undue burden—for analysis of protection of a woman's right to choose an abortion. However, the plaintiffs claim that *Casey* did not reduce the scrutiny for the "bodily integrity" privacy right. Therefore, Plaintiffs argue, the Court should scrutinize the Act's restrictions implicating bodily integrity under a strict scrutiny analysis.

The plaintiffs' argument concerning bodily integrity seems to concern the Act's exclusion from protection any fetus whose death occurred *in utero*, prior to any intact fetal part passing through the vaginal introitus. One method for ensuring fetal demise prior to a D & E or D & X procedure is to inject chemicals or medications, such as saline, prostaglandins, and/or urea, into the amniotic fluid. This injection would be given with the intent to cause the death of the fetus prior to the physician's extraction of any fetal part. Plaintiffs claim that physicians in Michigan would be forced to alter their procedures in this manner, in performing second trimester abortions, if the Act were allowed to go into effect. (WomanCare Plaintiffs' Brief, page 21.) Plaintiffs' argument is that this method of ensuring fetal demise also presents an increased risk to the health of the pregnant woman. Insuring fetal demise, plaintiffs say, is a less safe method of terminating pregnancy than the current D & E and D & X procedures. "[K]illing the fetus by injection requires a

surgical procedure that carries risks to maternal life and health." *Carhart v. Stenberg,* 972 F.Supp. 507, 527 (D.Neb. 1997), *affirmed* 192 F.3d 1142 (8th Cir. 1999), *cert. granted, appeal docketed* 528 U.S. 1110, 120 S.Ct. 865, 145 L.Ed.2d 725 (2000). Plaintiffs reason that the Act, "therefore requires a far more substantial intrusion upon a woman's bodily integrity and autonomy than those the Supreme Court has previously held to be unconstitutional—even as to individuals suspected of committing crimes." (WomanCare Plaintiffs' Brief, page 22, *citing Winston v. Lee,* 470 U.S. 753, 766, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) and *Rochin v. California,* 342 U.S. 165, 174, 72 S.Ct. 205, 96 L.Ed. 183 (1952)).

In *Winston,* the Court characterized as a severe intrusion an operation to remove a bullet. In *Rochin,* the Court held that forcible evacuation of stomach contents violated due process. Plaintiffs argue that the state could not have a compelling interest in forcing pregnant women to undergo procedures that are more dangerous than those currently allowed by law, and thus the Act should be invalidated as violative of a woman's right to privacy.

Within the context of the plaintiffs' request for injunctive relief, the Court need not reach a determination on this right to privacy / bodily integrity issue. Plaintiffs are not required to demonstrate substantial likelihood of success with regard to every argument they raise. It is sufficient if the plaintiffs persuade the Court that there is a substantial probability that the Act is unconstitutional. Plaintiffs may meet their burden through any one of their arguments. The Court need not, at this point, subject the Act to a strict scrutiny analysis for purposes of injunctive relief.

### f. Equal Protection

The WomanCare Plaintiffs allege that the Act violates equal protection. "Only

women get pregnant and, therefore, any statute that targets the right to abortion must be subject at least to a standard of intermediate review." (WomanCare Plaintiffs' Brief, page 3 1.) The plaintiffs engage in a discussion of pregnancy-based discrimination and sex-based classifications. Plaintiffs attempt to convince the Court that, should the Court choose not to utilize a strict scrutiny analysis under their privacy argument, the Court should at least adopt an intermediate scrutiny standard based on gender.

The defendants' brief does not address this argument, or the right to privacy argument for strict scrutiny analysis. Instead, Defendants claim that the Act is, "reasonably related to a valid state purpose". However, both the Evans Plaintiffs' brief and Defendants' brief concern themselves with analysis under *Roe, Casey,* and their progeny. The Supreme Court, in *Casey,* applied heightened scrutiny to its analysis in arriving at the "undue burden" standard. Thus, the undue burden analysis derived from *Casey* presents the proper analysis for the plaintiffs' challenge to the Act. In the context of injunctive relief analysis, the plaintiffs need only establish that they are likely to be successful on the merits of their constitutional challenge under the standards set forth in *Casey.* Plaintiffs need not establish substantial likelihood of success on every argument they set forth.

## 2. Threat of Irreparable Harm to the Plaintiffs

Plaintiffs argue that Michigan's Infant Protection Act, if allowed to go into effect, would "cause irreparable harm by preventing physicians from using a range of safe obstetrical and gynecological procedures, including virtually all previability abortions." (Plaintiff's Brief, page 24.) Plaintiffs state that physicians will be left with only three options: continue to provide services and treatment as they currently do, but face the threat of criminal prosecution under the Act; cease providing services banned by the Act; or continue providing services and treatment, but alter their practice to try to ensure fetal demise before any non-severed part of the fetus passes through the birth canal.

Plaintiffs first contend that if physicians continue providing care and treatment "as usual" they face threat of criminal prosecution under the Act. Plaintiffs argue that threat of arrest, conviction, monetary fines, and fear of incarceration represent "irreparable harm". Second, Plaintiffs could stop providing the care and treatment they believe is proscribed by the Act. "If physicians stopped providing the medically appropriate treatment that the Act bans during certain miscarriages and deliveries at term, the harm to women's health would be grave and irreparable." (Plaintiffs' Brief, page 25, citing the declarations of Plaintiff Timothy Johnson, M.D. and Plaintiff Mark Evans, M.D.) Plaintiffs assert that if Michigan physicians were to stop performing abortions as a result of the Act, Michigan women would be forced to travel outside of the state (or, perhaps the country, given our status as a border state) to obtain an abortion. Plaintiffs assert that the obstacles and financial burden in traveling out of state to obtain an abortion would be so great for some women as to constitute a denial of right to reproductive choice—an irreparable harm as any that can be imagined. (Plaintiffs' Brief, page 25.) Plaintiffs argue that the Act would severely undermine women's health and deprive them of their constitutional rights to choose previability abortion, and would, therefore, present the threat of imminent and irreparable harm. (Plaintiffs' Brief, page 26.)

To accept Defendants' argument that irreparable harm would not result from implementation of the Act, the Court would be required to accept the Attorney General's construction of the statute, rather than its plain meaning. Defendants assert that the statute does not criminalize D & C, induction, hysterotomy, hysterectomy, fetal surgery, or other medical actions because no subsequent, specific killing act occurs in those procedures. However, the statute does not speak only to a specific "killing act" inherent in D & X procedures, or in D & E procedures wherein the fetal skull is crushed. The state attempts to persuade the Court that physicians who perform abortions would not be held liable for the "killing acts" performed prior to the emergence of the fetus from the vaginal introitus—only for any "killing acts" performed *after* any part of the fetus emerges. Defendants' own arguments are confusing and circular. Defendants' inability to clearly articulate support for their own construction of the statute merely serves to support Plaintiffs' claim that the language of the Act is vague.

### 3. Substantial Harm to Others

Plaintiffs make a brief argument that no one will be harmed if this Court issues an injunction. The plaintiffs cite *Voinovich*, *supra*, in support of their assertion that a temporary restraining order would merely maintain the *status quo* while the Court addresses the constitutionality of the Act.

Defendants argue that Plaintiffs must be denied injunctive relief because they failed to demonstrate that a preliminary injunction would not injure the interests of the public. The defendants cite *Hamlin Testing Laboratories v. U.S. Atomic Energy Commission*, 337 F.2d 221, 222 (6th Cir. 1964) for the proposition that the Court must deny a preliminary injunction if the moving party fails to establish that the public interest would not be harmed by the requested relief. Specifically, the defendants state that issuing injunctive relief would fail to prevent, "the unnecessary deaths of live infants" in the State of Michigan. (Defendants' Brief, page 31.)

Since the defendants themselves claim that the Act is meant to criminalize only the D & X abortion procedures and D & E procedures which involve crushing the fetal skull, maintaining the *status quo*, particularly in light of this District's holding in *Evans*, *supra*, would not create any affirmative harm to others. Plaintiffs' Brief points out that the primary purpose of a preliminary injunction is to, "preserve the relative positions of the parties until a trial on the merits can be held." (WomanCare Plaintiffs' Brief, page 16, *citing Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir.1997), *quoting University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).) Therefore, it is likely that the plaintiffs will be successful in their argument that a temporary restraining order would not harm others, but would merely maintain the *status quo*, while the constitutionality of the Act is debated.

### 4. Public Interest

Plaintiffs offer an argument that, "[i]njunctive relief will serve the public interest because it will protect both the constitutional rights and the health of women in need of abortion services." (Plaintiffs' Brief, page 27.) Plaintiffs assert that the public would have no interest in furthering an unconstitutional statute. *Martin–Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir.1982). Instead, the plaintiffs contend that the public interest lies chiefly in safeguarding a woman's reproductive health and her right to a previability termination of pregnancy.

Defendants put forth the argument that the public interest, instead, lies in the implementation of the valid acts of its elected legislators. Defendants also contend that the harm alleged by the plaintiffs is merely speculative and hypothetical. The defendants ask that the Court find that the state's legitimate interest in the implementation of the Act outweighs Plaintiffs' mere apprehension of harm.

Both the plaintiffs and the defendants make arguments that suggest that the public interest lies in safeguarding a pregnant woman's health or in carrying out the statutes enacted by publicly elected officials. Chief among a public interest, however, would be the right to be free from the oppression of previously-recognized and constitutionally-protected rights. A pregnant woman's right to choose previability termination of her pregnancy is a right that has been recognized by the United States Supreme Court. Principles of *stare decisis* jurisprudence require that the Court find the greater public interest would be served by issuing the preliminary injunction in this case.

## V. Conclusion and Order

The Court finds that Plaintiffs, as physicians and providers of abortion services within the State of Michigan, have standing to assert their own rights as well as the rights of their patients, *jus tertii*. Plaintiffs have established, through legal argument and expert testimony, that there is a substantial likelihood that they will be successful on the merits of their constitutional challenge to Michigan's Infant Protection Act. Plaintiffs have also persuaded the Court that a threat of irreparable harm to the plaintiffs and/or their patients would exist if the Act were allowed to take effect. The Court determines that no substantial harm would befall others by maintaining the *status quo* while the constitu-

tionality of the Act is debated. Further, the Court finds that the public interest in protecting both the constitutional rights and the health of women in need of abortion services would be served by granting injunctive relief.

For the reasons stated above, IT IS HEREBY ORDERED that Defendants' Motions to Dismiss, based on lack of standing [00–70585: 14–1], [00–70586: 10–1] are DENIED.

Plaintiffs' Motions for Temporary Restraining Orders [00–70585: 11–1], [00–70586: 9–1], ARE HEREBY DEEMED MOOT.

Defendants' Motion to Strike Affidavits [00–70586: 12–1] WAS DENIED, for reasons stated on the record.

Plaintiffs' Motions to Make the Order Binding on All Prosecuting Attorneys, or to Certify the Defendants as a Class [00–70586: 11–1 and 11–2], ARE VOLUNTARILY WITHDRAWN.

Defendants James T. Cherry, Carl L. Marlinga, David G. Gorcyca, and John D. O'Hair ARE VOLUNTARILY DISMISSED from these actions.

IT IS FURTHER ORDERED that Plaintiffs' Motions for Preliminary Injunction [00–70585: 11–2], [00–70586: 9–2] are GRANTED. Defendant Jennifer Granholm, and the State of Michigan are hereby enjoined from enforcing 1999 Michigan Public Act No. 107 (to be codified at Mich. Comp.Laws § 750.90g).

This Order shall remain in effect until further Order of the Court.